UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

# 13 CV 2359

MARISSA CHUNISINGH,

Plaintiff,

vs.

TELOMERASE ACTIVATION
SCIENCES, INC. aka T.A. SCIENCES;
ASIA BIOTECH CORPORATION; and
NOEL THOMAS PATTON,

Defendants.

*Civil Action No.*

**COMPLAINT**

**JURY TRIAL DEMAND**



Plaintiff Marissa Chunisingh, by her attorneys, Stoll, Glickman, & Bellina, LLP, alleges

upon information and belief as follows:

## NATURE OF ACTION

1.      Plaintiff Marissa Chunisingh ("Ms. Chunisingh" or "Plaintiff") brings this action

against Defendants Telomerase Activation Sciences, Inc. ("TASI"), Asia Biotech Corporation

("Asia Biotech," together with TASI, the "Corporate Defendants") and Noel Thomas Patton

("Defendant Patton," together with the Corporate Defendants, "Defendants") for declaratory and

monetary relief and damages for injuries Plaintiff has sustained as a result of Defendants'

discrimination against her based on gender and ancestry/national origin (Caribbean national

origin and Indian/Southeast Asian ancestry, hereafter, "Indian"), including aggregated "sex-plus"

claims for gender and ancestry/national origin based discrimination, in violation of 42 U.S.C. §

1981 *et seq.* ("Section 1981") and the New York City Human Rights Law, Administrative Code

§ 8-107 *et seq.* ("NYCHRL").  Plaintiff also brings claims for breach of contract for Defendant

TASI's failure to pay earned variable compensation and restrictive covenant consideration

payments according to Plaintiff's employment contract, as well as claims for Defendants' failure

1

to pay earned overtime compensation and other earned wages under the Fair Labor Standards Act 29 U.S.C. § 216 *et seq.* ("FLSA") and/or the New York Labor Law Article 19, §§ 650 *et seq.* ("NYLL").

## JURISDICTION AND VENUE

2.     This Court has subject matter jurisdiction in this action, pursuant to 28 U.S.C. §§ 1332(a) as Plaintiff is a citizen of New York.  This Court has supplemental jurisdiction over Plaintiff's claims brought under the New York Labor Law and the New York City Human Rights Law pursuant to 28 U.S.C. § 1367.

3.     In addition, the Court has jurisdiction over Plaintiff's claims under the FLSA pursuant to 29 U.S.C. § 207 *et seq.*

4.     Further, the Court has jurisdiction over Plaintiff's claims under Section 1981 pursuant to 28 U.S.C. § 1331

5.     This Court is empowered to issue a declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202.

6.     Venue is proper in the United States District Court, Southern District of New York pursuant to 28 U.S.C. § 1391, because the discriminatory practices, wage violations and other unlawful conduct which gives rise to Plaintiff's claims occurred in this District.

7.     Defendants are subject to personal jurisdiction in New York.

8.     Defendant Patton, as founder, principal shareholder and Chairman of TASI, exercises control over the nature and structure of the employment relationship and economic control over the relationship such that he is an "employer" under Section 1981, the NYCHRL, the FLSA and the NYLL and is therefore individually subject to liability.

## PARTIES

9.      Plaintiff Marissa Chunisingh was employed by Defendants as a Sales and Client Services Administrator from January 2007 to December 2012 in their Manhattan headquarters. Plaintiff resides in South Ozone Park, Queens.

10.     Defendant Telomerase Activation Sciences, Inc., doing business as T.A. Sciences, Inc., maintains a principle place of business of 720 Lexington Avenue, 29th Floor, New York, NY 10029.  Defendant TASI is a privately held domestic corporation organized under the laws of New York.  Defendant TASI is a wholly owned subsidiary of Asia Biotech.

11.     Defendant Asia Biotech Corporation, as successor-in-interest to Asia Biotech Company, Limited, maintains a principal place of business of 24 East 64th Street, 5th Floor, New York, NY 10021.  Defendant Asia Biotech is a privately held domestic corporation organized under the laws of New York.

12.     Defendant Noel Thomas Patton personal residence is in Water Mill, New York which is in Suffolk County.  Defendant Patton is the Founder, President, Chief Shareholder, and Chairman of TASI.

13.     Defendant Asia Biotech Corporation, as successor-in-interest to Asia Biotech Company, Limited, has assumed the rights, duties, obligations and assets of Asia Biotech Company, Limited.

14.     At all relevant times, the Corporate Defendants employed more than 4 employees and made in excess of $500,000 in revenue annually.

## FACTUAL ALLEGATIONS

**Defendant Patton Establishes TASI In 2007 And Begins Marketing TA-65**

15.     On September 30, 2002, Geron Corporation ("Geron") and Asia Biotech
Company, Limited, entered into a Commercial License Agreement pursuant to which Asia
Biotech Company, Limited obtained an exclusive license to certain intellectual property of
Geron involving cell regeneration technology or "telomerase activation" as the process is
commonly known in the trade parlance.

16.     TASI is a corporation licensed by Geron through Asia Biotech Company, Limited
and its successor-in-interest Asia Biotech Corporation to sell a synthetic version of a medicinal
herb marketed as an agent of telomerase activation.

17.     TASI's product, TA-65, was launched in 2007 as a nutritional supplement and is
not a regulated prescription drug.

18.     Through an aggressive marketing campaign, TASI promotes TA-65 as an anti-
aging agent, stating in its public representations, "TA-65 offers the potential of reducing or
reversing telomere shortening and battles tissue and organ degeneration by rejuvenating aging
cells."

19.     Since its launch in 2007, TA-65 is developed and distributed from the "TA-
Sciences Center" which is also TASI's corporate headquarters in Manhattan.

20.     TA-65 is primarily available through physicians trained and licensed by TASI
throughout the United States, Europe, South America, and Asia.

21.     TA-65 is sold at a premium and in large doses with a minimum consumption
period of twelve months.

22.     TASI promotes a rigid course of dosing known as the "Patton Protocol" which requires consumers to take 1-4 capsules of TA-65 daily for a minimum of 2 years.

23.     A three-month supply of TA-65 costs between $600 and $2,200 and must be renewed four times before the protocol is complete.

## After Signing An Employment Contract, Plaintiff Begins Working For Defendants And Is Required To Work Long Hours Without Overtime Compensation

24.     Plaintiff was hired by the Corporate Defendants on June 1, 2007 as an administrative assistant by C. David Cross, then an Executive Vice President with TASI.

25.     A written employment agreement was executed between Plaintiff and TASI which defined Plaintiff's duties and the Corporate Defendants' compensation obligations, among other items, and bound the parties until either party terminated the contract.

26.     According to paragraph six of the employment agreement, Plaintiff was subject to a non-compete obligation for a period extending two years after the termination of the agreement.  In exchange for the non-compete obligation, the Corporate Defendants agreed to pay Plaintiff an extra $5,000 in compensation annually during the period of her employment and an additional sum of $500 per month during the 24-month period.

27.     According to paragraph 2 of the agreement, Plaintiff was expected to perform wholly administrative duties in her role including serving as an office receptionist, providing customer service to TASI's clients, maintaining office records, and serving as an administrative assistant to the executive leadership.

28.     Plaintiff's duties changed after she was given more inside-sales responsibilities following a promotion, however, aside from this change, she performed essentially the same role throughout her employment.

29.     Under either title, Plaintiff performed almost exclusively nonexempt administrative and inside sales work; she was not responsible for supervising any other employees.

30.     Upon information and belief, Defendants intentionally misclassify most of their staff as non-employee independent contractors or otherwise FLSA exempt for the sake of saving the additional business expenses associated with classifying them properly.

31.     After she began, for the second half of 2007, Plaintiff was similarly misclassified as a non-employee independent contractor and paid an hourly wage on an IRS form 1099.

32.     However, in reality, Plaintiff's employment was permanent and full time.  In fact, as previously mentioned, Plaintiff's employment was governed by a written contract which, in paragraph 1.01 and repeatedly throughout, refers to her as an employee and assumes a long term employee-employer relationship.

33.     Further, Plaintiff was provided with resources by Defendants, including an office, desk, computer and office supplies to perform her work, and she was expected to hold herself out to the public and Defendants' clients as an employee of TASI.

34.     Later, on January 1, 2008, Plaintiff's status was changed over to full time employee with an annual salary of $35,000.

35.     When Plaintiff started, she was the only administrator on staff and, as a result, she quickly gained a sense for TASI's operation and the skills needed to perform her job.

36.     Plaintiff performed well in her position and her performance was lauded by her direct supervisor who, in the only written performance review received by Plaintiff while employed by Defendants, rated her performance excellent.

37.    Plaintiff often worked between 50 and 60 hours a week, continuing to handle telephone calls from clients and physician merchandisers at home after she left work and routinely working on Sundays.

38.    Further, for the entire tenure of her employment, Plaintiff's duties qualified her for overtime compensation under the NYLL and the FLSA.

39.    Despite this, she was never paid an overtime premium for any of the hours she worked over 40 in any workweek.

**Defendant Patton Creates A Culture Of Humiliation By Singling Out Plaintiff Because Of Her National Origin/Ancestry, Including Routinely Referring To Plaintiff As "The Sand Nigger" To His Colleagues In The Workplace**

40.    Defendant Patton routinely uses highly offensive slurs in the workplace and openly admits to indefensible and unlawful biases.

41.    For instance, Plaintiff was informed by other employees that, in reference to her Indian/Southeast Asian ethnicity, Defendant Patton routinely referred to Plaintiff as "the sand nigger" in the workplace

42.    Upon reliable information, Plaintiff is aware that Defendant Patton used this slur routinely when making reference to her outside of her presence and with certain colleagues with whom he felt comfortable and maintained a personal rapport.

43.    Defendant Patton also made his discriminatory feelings known in a staff meeting attended by Plaintiff.  During a discussion about expanding international operations, a physician in India was identified as a potential distributor.  In response, Defendant Patton declined to pursue the lead, stating "Indian people are unscrupulous and can't be trusted."  Shocked, Plaintiff made her displeasure known by stating, "Hello?! I'm of Indian descent."  While Defendant Patton failed to acknowledge Plaintiff's protest, Defendant's Marketing Director Greta Blackburn, also

a close confidant of Defendant Patton who had supervisory authority over Plaintiff and who mistreated her, stated, "Well, it's true." .

44. Defendant Patton showed a similar contempt for other protected classes, including African-Americans voicing his opinion on several occasions that his product was not for "blacks" and at times refused to sign off on marketing material that included images of African Americans.

45. On one particular occasion, after Ms. Blackburn was dismissed from her post at TASI, Plaintiff was assigned to be the 'catch all' for her unattended incoming email. In her inbox, Ms. Blackburn received emails involving racist jokes or racially offensive content. One of the emails received, which had also been circulated to Defendant Patton, showed a picture of President Barak Obama with a picture of a chimpanzee photo-shopped over his head.

46. Defendant Patton also told Plaintiff, on more than one occasion, that he did not trust Puerto Ricans, Jews, or Koreans. Defendant Patton told Plaintiff that the reason he did not trust Koreans, in particular, related to his perception that they possessed an innate aggressiveness which translated into poor communication skills. Defendant Patton summarized his discriminatory belief on more than one occasion saying, "They fuck everything up by being too aggressive."

47. Plaintiff was highly offended and humiliated by Defendant Patton's behavior, however, given the strong likelihood of retaliation if she protested, she remained silent in order to protect her employment.

**Defendant Patton Subjects Plaintiff To Degrading Comments Regarding Her Gender,
Creates A Hostile And Sexually Charged Work Environment, And Fails To Provide The
Same Opportunities As Those Offered To Similarly Situated Or Less Qualified Men**

48.     Between 2007 and 2009, outside of her administrative responsibilities, Plaintiff's

other responsibilities mostly involved providing client service with respect to TASI's unofficial

clinical trials of TA-65 to TASI's clients and third party investors in TASI and TA-65 who

"volunteered" for the trials by paying a $25,000 fee.

49.     Between 2009 and her termination in 2012, Plaintiff gradually assumed more

sales responsibilities through her own initiative, including developing international sales leads

through physician-distributors in certain geographic regions abroad and developing "organic

leads" through cold calling.

50.     However, Plaintiff's compensation, reputation within the office, and opportunity

for further development and advancement did not increase proportional to her achievement, if at

all.

51.     If Plaintiff received recognition, new responsibilities or increased compensation,

it was only when Plaintiff insisted on it in confrontations with Defendant Patton which further

branded her as unhappy and disloyal despite her entirely legitimate requests for fair treatment.

52.     As Plaintiff's inside sales duties increased, her existing duties, including handling

all of the office's administrative responsibilities and providing client support for all of TASI's

clients, were not decreased.

53.     Early in her employment, Plaintiff identified a disturbing pattern of gender bias in

how Defendant Patton treated his subordinates, a problem which was compounded by Defendant

Patton's degrading and sexist comments in the workplace.

54. More specifically, immediately after starting her employment, Plaintiff was subjected to Defendant Patton's frequent, demeaning and childishly provocative outbursts made in her presence regarding his sexual preferences and sexual experiences.

55. Defendant Patton made these comments without regard for the social setting, including during both one-on-one conversations and larger staff meetings.

56. Defendant Patton's comments were also reliably frequent and occurred daily during certain stretches of Plaintiff's employment.

57. Because she sat in a location which allowed for her to hear Defendant Patton's conversations during the day, she often overheard his interviews with prospective female candidates for employment.

58. On one such occasion, Plaintiff overhead Defendant Patton tell a non-white female candidate for employment that she was pretty and ask if she was "mixed," a reference to her multiethnic ancestry.

59. In addition to making lewd jokes and remarks, Defendant Patton repeatedly made awkward and unwanted passes at subordinate female employees, including asking other female employees out for drinks after work.

60. Defendant Patton would also physically simulate sexual acts while telling sexually graphic stories in the presences of other employees.

61. According to another coworker, Defendant Patton repeatedly asked Sarah Murphy, the former Director of Finance, out for drinks with him, at one point cornering her in her cubicle and making a masturbation gesticulation. The incident took place in Ms. Murphy's office and in the presence of two other male employees who laughed at Mr. Patton. Ms. Murphy later described the experience as nonconsensual and "terrifying."

62.     Having also experienced Defendant Patton's lewd and inappropriate behavior in the workplace not specifically directed at her, Ms. Murphy complained to the other women in the office about his behavior saying that she felt uncomfortable around him.

63.     Ms. Murphy was encouraged in complaining by all of the other women in the office, including Plaintiff, who were similarly offended by Defendant Patton's behavior but who were unwilling to accept the substantial risk of retaliation by joining her.

64.     Ms. Murphy complained to Plaintiff directly and Plaintiff recommended that she complain to Clarissa Versteegh, TASI's Operations Manager, given Defendant Patton's complete lack of respect for Ms. Murphy or her role.

65.     Ms. Murphy ultimately did complain about sexual harassment verbally to Ms. Versteegh who escalated the complaint to Defendant Patton, albeit while speaking generally about office culture and without identifying Defendant Patton as the subject of the complaint or Ms. Murphy as the complaining employee. Ms. Versteegh later complained in an email to Defendant Patton, outlining the law as it pertains to sexual harassment in the workplace.

66.     In response, Defendant Patton called each of the women into his office and asked them if they felt comfortable with his behavior, telling each of them before they responded, "Now, be careful how you respond."

67.     Oblivious to his own involvement in creating a demeaning and sexist culture, and despite his obvious conflict of interest, Defendant Patton assumed all control of the investigation into Ms. Murphy's entirely legitimate allegations. To the surprise of no one, Defendant Patton dismissed Ms. Murphy's allegations at the conclusion of his sham investigation.

68. Defendant Patton announced the results of his investigation by calling a meeting with Ms. Versteegh and angrily ripping up the email, and a copy of the law she gave him, stating, "There is no sexual harassment here."

69. Shortly therefore, Defendant Patton mentioned to Ms. Versteegh that he told the other males in the office, "Don't let them win" in reference to Ms. Versteegh and the other women in the office.

70. Notably, neither Defendant Patton nor any other employee working with the Corporate Defendants ever implemented an employment handbook and no formal policy existed for reporting discrimination and harassment.

71. Defendant Patton also delegated all of the administrative work and menial low level tasks to only the women in the office. In particular, Defendant Patton insisted that the women in the office -- many of whom held professional degrees and substantial responsibility -- fax documents for him, clean his office and his desk, and make his tea every day.

72. In fact, in one of many confrontations with Defendant Patton about her low compensation and how she deserved to be paid more, Plaintiff told Defendant Patton, "You will never see me as anything more than your tea girl," a statement which Defendant Patton did not deny or protest.

73. Cleaning Defendant Patton's desk, in particular, could be a hazardous and degrading experience given his propensity for sexual indiscretions in the office. For instance, Ms. Versteegh was obliged to remove a dildo, pornography, lubricant and condoms found in Defendant Patton's desk when she was cleaning it. Again, humiliating tasks such as this fell only to the women in the office.

74.     Further, on account of her gender and ethnicity, Plaintiff's substantial

achievements were not recognized because of Defendants Patton's open hostility towards her

protected characteristics.

75.     As mentioned above, in March 2011, Plaintiff received an excellent review from

her immediate supervisor which emphasized the substantial amount of revenue she had brought

in through her sales efforts.  Specifically, in the context of her developing insides sales role,

Plaintiff had made extensive client contacts and closed sales of TA-65 resulting from these

efforts.

76.     Despite her tireless effort, Plaintiff was inexplicitly promoted in 2011 to a

middling position created specifically for her, "Sales Administrator," for which she was

overqualified and underpaid, instead of to a more senior "Sales Manager" as she desired and

deserved.

77.     Adding insult to injury, Defendant Patton refused to sign off on the final 2011

review, stating, "It can't be this good – she won't have any room to learn."  Rather than revise

the review, Plaintiff did not receive a written review for the year, or a pay raise which accurately

reflected her substantial contribution.  Plaintiff never received another review during her

employment and her early tireless efforts to establish a client base abroad went essentially

unnoticed by Defendant Patton or any of TASI's leadership.

78.     Defendants' failure to provide a review frustrated Plaintiff's reasonable

expectation that she would be compensated fairly for her contributions.  Notably, Defendants'

treatment of Plaintiff was in direct contrast to how non-Indian male colleagues in similar

positions were treated, all of whom received written or verbal feedback and assistance with

professional development.

79.     More specifically, in addition to not giving her a performance review or performance feedback, Defendants treated Plaintiff differently by failing to acknowledge her strong performance, failing to raise her compensation, insisting that she handle menial tasks, failing to reduce her workload which was substantially more than that of her non-Indian male comparators in the workplace, and failing to meritoriously advance her to positions of increasing responsibility and compensation.  Conversely, Defendants' less or similarly qualified non-Indian male colleagues received comparatively better treatment and more professional respect with respect to each of these conditions of employment.

80.     Additionally, these same comparably-skilled non-Indian men were hired into pure sales roles rather than the less desirable hybrid administrative role which Plaintiff held.  As a result, they earned more compensation despite having fewer responsibilities, less experience and an unproven track record.

81.     In fact, Defendant Patton engineered his staff based on gender-roles, announcing his preference to have women in administrative roles and men in sales positions.  However, the sales positions were more desirable and higher paying.

82.     By way of example, when Plaintiff expressed an interest in an open sales position which involved full-time sales responsibilities and which paid more than Plaintiff's position, Defendant Patton's Executive Assistant at the time, Weimin Liu, told Plaintiff that Defendant Patton would never allow Plaintiff to be considered for the position.  When Plaintiff asked why, Ms. Liu told her, "You know why," a reference to the fact that Plaintiff would not be "allowed" by Defendant Patton to assume the open sales position because of her gender.

83.     On a separate occasion, Plaintiff trained a non-Indian male who was hired in May 2011 into a junior "Sales Coordinator" position and groomed for a Sales Manager position that

Plaintiff had previously expressed an interest in without receiving any response. This was particularly egregious given that the male Sales Coordinator had far less experience than Plaintiff and was entirely unfamiliar with TASI's inside and international sales responsibilities and operation given that he had started only a year earlier. Plaintiff, on the other hand, had spent 6 years working tirelessly and successfully to develop her sales skills and promote the Company's marquee product.

84. In late 2012, the male trainee, now "Sales Coordinator," was promoted to Sales Manager after Plaintiff was dismissed.

85. Plaintiff was also shocked to learn that the rapidly promoted trainee was earning a salary that was higher than Plaintiff's after just 9 months on the job, notwithstanding his comparative lack of experience.

86. Plaintiff later learned from her immediate supervisor that she was among the lowest paid employees with the Company and that all of the non-Indian male Sales staff earned more than she did.

87. Further, Defendant Patton subjected Plaintiff to disproportionate performance scrutiny which the non-Indian men in office were not subject to, including having other employees monitor her attendance and punctuality.

88. Of the 10 women who worked for Defendant Patton while Plaintiff was employed, 7 (including Plaintiff) were terminated, a percentage that was significantly lower than the rate at which men were terminated.

89. Given this gross mistreatment, Plaintiff grew resentful and angry and began confronting Defendant Patton about his failure to respect her work and her skill by promoting her and paying her a reasonable salary.

90.     In December 2012, Plaintiff again raised the issue of her low compensation with Defendant Patton who responded by telling her that she complained too much and was ungrateful for the opportunity she had already been provided by him.

91.     The matter of Plaintiff's treatment came to a head on December 10, 2012 when just days prior, Plaintiff reviewed an international distributor contract and recommended to Defendant Patton that it be rewritten.  Plaintiff submitted proposed edits to Defendant Patton who, rather than working off of Plaintiff's proposed edits, forwarded the email to a male contractor asking him to review Plaintiff's edits, thereby creating a patronizing and insulting additional level of review.

92.     Defendant Patton had a regular habit of insisting that other male employees check the quality of Plaintiff's work, an effort that was entirely unjustified.  In addition, Defendant Patton would always give his non-Indian male employees the benefit of the doubt and never subjected them to humiliating and unnecessary handholding.

93.     The incident was a final straw for Plaintiff who again complained in email and in person about Defendant Patton's lack of appreciation and respect for her work.

94.     In response, Defendant Patton acknowledged that he had struggled to recognize Plaintiff's contributions but refused to take any responsibility for his role in treating Plaintiff unfairly.

95.     That same day, Defendant Patton fired Plaintiff after an angry conversation where he accused her of being ungrateful for what he had done for her.

96.     Within 3 weeks, Defendant Patton promoted a non-Indian male Sales Manager to assume Plaintiff's responsibilities.

97.     Plaintiff was invisible to Defendant Patton in the workplace on account of her gender and ethnicity, so much so that Defendant Patton was incapable of recognizing her substantial contributions, her human need for recognition, and her right to professional respect and fair compensation. So complete was Defendant Patton's inability to recognize Plaintiff that he was capable of openly insulting persons of her national origin in her presence without even knowing or caring that he had done so.

**Despite Their Contractual Obligations To Do So, The Corporate Defendants Fail To Pay Plaintiff Her Promised Variable Compensation And Restrictive Covenant Consideration Payments**

98.     According to the terms of her written employment contract, in addition to her salary, Plaintiff was eligible for a discretionary bonus which was to be paid at the end of the year.

99.     In 2012, Defendants notified Plaintiff and all employees in writing of changes to the bonus structure.

100.     Specifically, the bonus was broken down into two components: (i) a discretionary bonus based on overall performance which was very similar to the existing bonus but smaller in size; and (ii) a nondiscretionary sales incentive plan with tiered goals and corresponding flat bonuses.

101.     In addition, as mentioned above, Plaintiff's employment contract guaranteed her an annual payment of $5,000 for each year of her employment in exchange for her commitment to be bound by a two-year noncompete obligation following her separation, which also provided for an additional $500 each month for the two years she was restricted from competing after leaving TASI.

102.    Defendant TASI failed to honor these obligations.  Specifically, Defendant TASI

failed to pay Plaintiff an earned nondiscretionary bonus for 2012 and all of her noncompete

consideration payments except for two $500 payments received by Plaintiff for January 2013 and

February 2013.

103.    Despite this, following her termination, Defendant TASI sent Plaintiff a letter

indicating their intent to enforce the noncompete obligation in her employment contract.

## AS AND FOR A FIRST CAUSE OF ACTION

### "SEX-PLUS" GENDER AND ANCESTRY/NATIONAL ORIGIN DISCRIMINATION –
### DISPARATE TREATMENTIN VIOLATION OF THE NEW YORK CITY HUMAN
### RIGHTS LAW

**(Administrative Code § 8-107 *et seq.*)**
**(Against All Defendants)**

104.    Plaintiff hereby repeats and re-alleges each and every one of the above-referenced

allegations as if fully set forth herein.

105.    Plaintiff is female and of Caribbean national origin and Indian/Southeast Asian

ancestry, so she is within the protected "sex-plus" class of individuals.

106.    Plaintiff performed satisfactorily since her job performance met or exceeded the

Defendants' expectation.

107.    Defendant subject Plaintiff to adverse employment actions on account of her

protected status and denied her equal opportunity and treatment in the conditions of

employment, including, but not limited to, being requiring her to handle menial tasks while not

insisting on the same for non-Indian male employees, failing to provide performance

evaluations or feedback while providing the same to non-Indian male employees, failing to

promote her to desirable positions she was qualified for while promoting under qualified males

to those same positions, failing to pay her a fair wage compared with her non-Indian male

colleagues for similar work performed, excessively and unnecessarily scrutinizing her performance and disciplining her while failing to do the same for other non-Indian male employees, failing to reduce her workload which was substantially more than that of her non-Indian male comparators, and discharging her from her position for insisting on comparable compensation and opportunity in employment and replacing her with other equally or less qualified non-Indian men who, upon information and belief, were paid the same or more than Plaintiff.

108.    Defendants discharged Plaintiff under circumstances giving rise to an inference of discrimination since non-Indian male workers, less qualified or equal to Plaintiff's qualifications were not selected for termination, or, alternatively, were hired to replace Plaintiff and/or assume her responsibilities or hired to fill positions for which Plaintiff was qualified.

109.    By the acts and practices described above, the Defendants, directly and/or through their employees and/or agents, subjected Plaintiff to discrimination in violation of the New York City Human Rights Law.

110.    Defendant Patton, who exercised managerial/supervisory control over Plaintiff, participated in the discriminatory acts and failed to take corrective action; regardless, Defendants are strictly liable for their acts and those of their employees under the NYCHL.

111.    As a direct and/or proximate result of the Defendants' unlawful conduct, Plaintiff has suffered irreparable injuries and monetary damages and will continue to do so unless the Court grants relief.

### AS AND FOR SECOND AND THIRD CAUSES OF ACTION

## UNLAWFUL HARASSMENT BASED ON ANCESTRY/NATIONAL ORIGIN (2) AND GENDER (3) IN VIOLATION OF THE NEW YORK CITY HUMAN RIGHTS LAW

### (Administrative Code § 8-107 *et seq.*)
### (Against All Defendants)

112.    Plaintiff hereby repeats and re-alleges each and every one of the above-referenced allegations as if fully set forth herein.

113.    Plaintiff was subjected to a hostile working environment since the Defendants' workplace was permeated with highly offensive slurs and discriminatory intimidation, ridicule, demeaning behavior and insult that was sufficiently pervasive to alter the conditions of her employment and create an abusive working environment since she was for extended periods of time subjected on a daily basis to discriminatory statements and treatment based on her gender and national origin/ancestry (independently, as separate causes of action).

114.    A specific basis exists for imputing the objectionable conduct to the employer because TASI's owner, Defendant Patton, was responsible for the conduct or openly condoned the conduct of others or failed to discourage the conduct of others and, as a result, no change resulted in the conduct of the specified.

115.    Regardless, under the NYCHRL, the Corporate Defendants are strictly liable for the unlawful acts of its employees.

116.    The discriminatory conduct was frequent and severe.

117.    The discriminatory conduct was physically offensive and humiliating.

118.    The discriminatory conduct involved offensive utterances.

119.    The discriminatory conduct interfered with Plaintiff's work performance and impacted the terms and conditions of her employment.

120.   As a direct or proximate result of the Defendant's unlawful conduct, Plaintiff has suffered irreparable injuries and monetary damages and will continue to do so unless the Court grants relief.

121.   Defendant Patton, who exercised managerial/supervisory control over Plaintiff participated in the discriminatory acts and failed to take corrective action.  As such, the Defendants are liable.

## AS AND FOR A FOURTH CAUSE OF ACTION

### ANCESTRY/NATIONAL ORIGIN DISCRIMINATION – DISPARATE TREATMENT IN VIOLATION OF SECTION 1981

**(42 U.S.C. § 1981 *et al.*)**
**(Against All Defendants)**

122.   Plaintiff hereby repeats and re-alleges each and every one of the above-referenced allegations as if fully set forth herein.

123.   Plaintiff is of Caribbean national origin and Indian/Southeast Asian ancestry, so she is within the protected class of individuals.

124.   Plaintiff performed satisfactorily since her job performance met or exceeded the Defendants' expectation.

125.   Defendant subject Plaintiff to adverse employment actions on account of her protected status and denied her equal opportunity and treatment in the conditions of employment, including, but not limited to, being requiring her to handle menial tasks while not insisting on the same for non-Indian male employees, failing to provide performance evaluations or feedback while providing the same to non-Indian male employees, failing to promote her to desirable positions she was qualified for while promoting under qualified males to those same positions, failing to pay her a fair wage compared with her non-Indian male colleagues for similar work

performed, excessively and unnecessarily scrutinizing her performance and disciplining her while failing to do the same for other non-Indian male employees, failing to reduce her workload which was substantially more than that of her non-Indian male comparators, and discharging her from her position for insisting on comparable compensation and opportunity in employment and replacing her with other equally or less qualified non-Indian men who, upon information and belief, were paid the same or more than Plaintiff.

126.   Defendants discharged Plaintiff under circumstances giving rise to an inference of discrimination since non-Indian male workers, less qualified or equal to Plaintiff's qualifications were not selected for termination, or, alternatively, were hired to replace Plaintiff and/or assume her responsibilities or hired to fill positions for which Plaintiff was qualified.

127.   By the acts and practices described above, the Defendants, directly and/or through their employees and/or agents, subjected Plaintiff to discrimination in violation of Section 1981.

128.   Defendant Patton, who exercised managerial/supervisory control over Plaintiff participated in the discriminatory acts and failed to take corrective action.

129.   As a direct and/or proximate result of the Defendant's unlawful conduct, Plaintiff has suffered irreparable injuries and monetary damages and will continue to do so unless the Court grants relief.

## AS AND FOR A FIFTH CAUSE OF ACTION

## UNLAWFUL HARASSMENT BASED ON ANCESTRY/NATIONAL ORIGIN

### (42 U.S.C. § 1981 *et seq.*)
### (Against All Defendants)

130.   Plaintiff hereby repeats and re-alleges each and every one of the above-referenced allegations as if fully set forth herein.

131.    Plaintiff was subjected to a hostile working environment since the Defendant' workplace was permeated with highly offensive slurs and discriminatory intimidation, ridicule, demeaning behavior and insult that was sufficiently pervasive to alter the conditions of her employment and create an abusive working environment since she was for extended periods of time subjected on a daily basis to discriminatory statements and treatment based on her ancestry/ national origin.

132.    A specific basis exists for imputing the objectionable conduct to the employer because TASI's owner, Defendant Patton, was responsible for the conduct or openly condoned the conduct of others or failed to discourage the conduct of others and, as a result, no change resulted in any change in the conduct of the specified.

133.    The discriminatory conduct was frequent and severe.

134.    The discriminatory conduct was physically offensive and humiliating.

135.    The discriminatory conduct involved offensive utterances.

136.    The discriminatory conduct interfered with Plaintiff's work performance and impacted the terms and conditions of her employment.

137.    As a direct or proximate result of the Defendants' unlawful conduct, Plaintiff has suffered irreparable injuries and monetary damages and will continue to do so unless the Court grants relief.

138.    Defendant Patton, who exercised managerial/supervisory control over Plaintiff participated in the discriminatory acts and failed to take corrective action.  As such, the Defendants are liable.

## AS AND FOR A SIXTH CAUSE OF ACTION

## (UNLAWFUL FAILURE TO PAY OVERTIME COMPENSATION UNDER THE FAIR LABOR STANDARDS ACT)

### (20 U.S.C. § 201, *et seq.*)
### (Against All Defendants)

139.    Plaintiff alleges and incorporates by reference the allegations in the preceding paragraphs.

140.    At all relevant times, Corporate Defendants have been an "employer" engaged in interstate commerce and/or in the production of goods for commerce, within the meaning of the FLSA, 20 U.S.C. § 203.

141.    At all relevant times, Defendants have employed and continues to employ employees, including Plaintiff.

142.    At all relevant times, upon information and belief, Corporate Defendants had gross operating revenues in excess of $500,000.00.

143.    The FLSA requires each covered employer to compensate all non-exempt employees at a rate of not less than one and one-half times the regular rate of pay for work performed in excess of forty hours per work week.

144.    During her employment with Defendants, within the applicable statute of limitations, Plaintiff worked in excess of forty hours per workweek without lawful overtime compensation.

145.    Despite the hours worked by Plaintiff, Defendants willfully, in bad faith, and in knowing violation of the Federal Fair Labor Standards Act, failed and refused to pay her overtime compensation.

146.     By failing to accurately record, report, and/or preserve records of hours worked by Plaintiff, Defendants have failed to make, keep, and preserve records with respect to each of its employees sufficient to determine their wages, hours, and other conditions and practices of employment, in violation of the FLSA, 20 U.S.C. § 201, et seq.

147.     The foregoing conduct, as alleged, constitutes a willful violation of the FLSA, within the meaning of 29 U.S.C §§ 216(b) and 255(a), entitling Plaintiff to an award of liquidated damages and such other legal and equitable relief as the Court deems just and proper.

148.     Plaintiff further seeks recovery of her attorneys' fees and costs to be paid by Defendants, as provided by the FLSA, 29 U.S.C. § 216(b).

## AS AND FOR A SEVENTH CAUSE OF ACTION

### (UNLAWFUL FAILURE TO PAY OVERTIME COMPENSATION UNDER THE NEW YORK LABOR LAW)

#### (Against All Defendants)
#### (New York Labor Law Article 19, §§ 650 *et seq.*)

149.     Plaintiff alleges and incorporates by reference the allegations in the preceding paragraphs.

150.     At all relevant times, Plaintiff was an employee and Defendants have been an employer within the meaning of the New York Labor Law.

151.     The overtime wage provisions of Article 19 of the New York Labor Law and its supporting regulations apply to Defendants.

152.     Defendants have failed to pay Plaintiff overtime wages to which she is entitled under the New York Labor Law.

153.     By Defendants' failure to pay Plaintiff premium overtime wages for hours worked in excess of 40 hours per week, they have willfully violated the New York Labor Law Article 19,

§§ 650 *et seq.*, and the supporting New York State Department of Labor Regulations, including but not limited to the regulations in 12 N.Y.C.R.R. Part 142.

154.    Due to Defendants' violations of the New York Labor Law, Plaintiff is entitled to recover from Defendants her unpaid overtime wages, liquidated damages, reasonable attorneys' fees and costs of the action, and pre-judgment and post-judgment interest.

## AS AND FOR AN EIGHTH CAUSE OF ACTION

### (BREACH OF CONTRACT)

### (Against Defendant TASI)

155.    Plaintiff re-alleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

156.    Defendant TASI entered into a written employment agreement with Plaintiff.

157.    Plaintiff provided her labor and services to Defendant TASI pursuant to the employment agreement and in fulfillment of that employment agreement.

158.    Defendants breached their obligations to Plaintiff under the employment agreement by failing to pay plaintiff compensation guaranteed under the terms of the contract as drafted and later amended verbally and/or in writing.

159.    Specifically, Defendant TASI failed to pay Plaintiff an earned nondiscretionary bonus for 2012 and all of her noncompete consideration payments except for two $500 payments received by Plaintiff for January 2013 and February 2013 guaranteed by her contractual agreements with Defendant TASI.

160.    These contractual violations were of a severity and totality that make clear the absence of good faith and fair dealing on the part of the Defendants in entering into a contract for employment with Plaintiff.

161.    Plaintiff suffered injuries and damages as a direct and proximate result of Defendants' breach of contract.

### AS AND FOR A NINTH CAUSE OF ACTION

### (UNLAWFUL FAILURE TO PAY WAGES UNDER THE NEW YORK LABOR LAW)

**(Against All Defendants)**
**(New York Labor Law Article 6, § 190 *et seq.*)**

162.    Plaintiff alleges and incorporates by reference the allegations in the preceding paragraphs.

163.    At all relevant times, Plaintiff was an employee and Defendants have been an employer within the meaning of the New York Labor Law.

164.    The overtime wage provisions of Article 6 of the New York Labor Law and its supporting regulations apply to Defendants.

165.    Defendants have failed to pay Plaintiff earned and unpaid wages to which she is entitled under the New York Labor Law.

166.    Specifically, Specifically, Defendants failed to pay Plaintiff an earned nondiscretionary bonus for 2012 and all of her non-compete consideration payments except for two $500 payments received by Plaintiff for January 2013 and February 2013 guaranteed by her Defendant TASI.

167.    By Defendants' failure to pay Plaintiff earned wages, Defendants have willfully violated the New York Labor Law Article 6, §19 *et seq.*, and the supporting New York State Department of Labor Regulations.

168.    Due to Defendants' violations of the New York Labor Law, Plaintiff is entitled to recover from Defendants her unpaid wages, liquidated damages, reasonable attorneys' fees and costs of the action, and pre-judgment and post-judgment interest.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court enter a judgment and issue:

(a)   An award to Plaintiff for her actual damages in an amount to be determined at trial for lost wages and benefits, including an award of back pay and front pay, under the NYCHRL and Section 1981;

(b)   An award to Plaintiff of compensatory damages in an amount to be determined at trial for the humiliation, mental anguish, pain and suffering and emotional distress sustained by her under the NYCHRL and Section 1981;

(c)   An award of punitive damages to deter future conduct by the Defendant, in an amount to be determined at trial under the NYCHRL and Section 1981;

(d)   Actual damages and all available make whole relief for Defendants' breach of Plaintiff's employment contract,

(e)   An award to Plaintiff of the costs of this action, including reasonable attorneys' fees to the fullest extent permitted by the NYCHRL, Section 1981, the FLSA, the NYLL, and pursuant to the terms of Plaintiff's employment contract which allows for fee shifting in the event of a breach action;

(f)   An award of liquidated damages for Plaintiff's FLSA and NYLL claims;

(g)   An award of pre- and post-judgment interest on all of Plaintiff's statutory and contract claims;

(h)   Such other and further relief as this Court deems necessary and proper.

## JURY DEMAND

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands a trial by jury.

DATED:  April 8, 2013

Stoll, Glickman & Bellina LLP

Christopher Q. Davis (CD-7282)
Stoll, Glickman & Bellina, LLP
475 Atlantic Avenue
Third Floor
Brooklyn, NY 11217
(718) 852-3710

*Attorneys for Plaintiff*